IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON

JAMES A. COMUZIE,

  Plaintiff,

v.           CASE NO. 6:07-cv-00644

MICHAEL J. ASTRUE,
Commissioner of Social Security,

  Defendant.

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for disability insurance benefits ("DIB") and supplemental security income ("SSI"), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  By standing order, this case was referred to this United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B).

Plaintiff, James A. Comuzie (hereinafter referred to as "Claimant"), filed applications for SSI and DIB on December 6, 2004, alleging disability as of December 1, 2003, due to right hip replacement, heart/cardiac stent placement surgery, high blood pressure, high cholesterol, depression, back, chest, arm, hand, leg, and foot pain/numbness; must change positions frequently and

walks with a limp.  (Tr. at 19, 54-57, 82, 106-108, 111.)  The claims were denied initially and upon reconsideration. (Tr. at 19, 43-45, 47-49.)  On June 30, 2006, Claimant requested a hearing before an Administrative Law Judge ("ALJ").  (Tr. at 50.)  The hearing was held on October 25, 2006 before the Honorable James P. Toschi.  (Tr. at 33, 935-953.)  By decision dated November 21, 2006, the ALJ determined that Claimant was not entitled to benefits.  (Tr. at 19-31.)  The ALJ's decision became the final decision of the Commissioner on August 27, 2007, when the Appeals Council denied Claimant's request for review.  (Tr. at 7-11.)  On October 16, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g).

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972).  A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2002).  If an individual is found "not

2

disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2002). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to

3

perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he has not engaged in substantial gainful activity since the alleged onset date. (Tr. at 21.) Under the second inquiry, the ALJ found that Claimant suffers from the severe impairments of status post right hip replacement, degenerative disc disease of the cervical, lumbar, and thoracic spines, osteoarthritis of the right shoulder, and coronary artery disease with status post stent placement. (Tr. at 21-25.) At the third inquiry, the ALJ concluded that Claimant's impairments do not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 25-26.) The ALJ then found that Claimant has a residual functional capacity for less than the full range of work at the sedentary exertional level, reduced by nonexertional limitations. (Tr. at 26-29.) As a result, Claimant cannot return to his past relevant work. (Tr. at 29.) Nevertheless, the ALJ concluded that Claimant could perform jobs such as surveillance-system monitor and dowel pin inspector which exist in significant numbers in the national economy. (Tr. at 30.) On this basis, benefits were denied. (Tr. at 31.)

Scope of Review

The sole issue before this court is whether the final decision

4

of the Commissioner denying the claim is supported by substantial evidence.   In <u>Blalock v. Richardson</u>, substantial evidence was defined as

> "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'"

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Cellebreze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the court, is charged with resolving conflicts in the evidence.   <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).   Nevertheless, the courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational."   <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was 44 years old at the time of the administrative hearing. (Tr. at 29.) He has a ninth grade education. (Tr. at 29.) He attended special education classes. (Tr. at 940-41.) He has a certificate in small gas engine repair. (Tr. at 941.) In the past, he worked as a small engine mechanic, a mechanic, a

laborer in block and brick masonry, and a golf course maintenance worker. (Tr. at 29, 90.)

<u>The Medical Record</u>

The court has reviewed all evidence of record, including the medical evidence of record, and will summarize it briefly below.

On July 13, 2003, Claimant was admitted to a Camden Clark Hospital for observation of acute low back and radiculopathy, after falling on wooden steps. (Tr. at 135.) His secondary diagnoses were "hyperlipidemia, coronary artery disease, tobacco use, status post angioplasty, status post right hip joint replacement." (Tr. at 137.)

On July 14, 2003, during Claimant's hospitalization, Seyed A. Ghodsi, M.D. reported "Lumbar spine x-rays are reviewed and show no evidence of obvious fracture/dislocation. There is some arthritic changes of both L3 and L4. On the CT scan there appears to be disc herniation at L4-5 which causes some stenosis. I did not see any obvious abnormality at L5-S1... Will await report from radiology." (Tr. at 143-44.)

On July 14, 2003, during Claimant's hospitalization, Kenneth Miller, M.D., radiologist, provided an MRI report, which stated: "1. There is degenerative disc disease at L3-4 and L4-5. 2. There is mild bulging of disc at L3-4 and a small to moderate broad midline disc protrusion at L4-5 which abuts the thecal sac. 3. No compression abnormality." (Tr. at 139, 146, 176.)

On July 14, 2003, during Claimant's hospitalization, W. M. Hensley, M.D., radiologist, provided a CT of the lumbar spine and reported: "1.  Disc abnormalities include moderate bulging of the L3-4 disc and a small-moderate sized midline disc protrusion at L4-5 (causing mild sac compression).  2.  Facet degeneration is greatest on the right at L5-S1." (Tr. at 147.)

On July 14, 2003, during Claimant's hospitalization, B. O. Garrett, D.O., radiologist, reviewed five x-ray views of the lumbar spine and provided this impression:  "1.  Equivocal slight depression of the superior end plate of L4 with sclerotic margins. I suspect this is remote in nature.  Grossly I see no evidence of acute fracture.  2.  Mild degenerative spurring of the anterior superior margins of the vertebral bodies." (Tr. at 148.)

During his hospitalization, Claimant was provided "multiple doses of IV Morphine and Toradol for pain."  (Tr. at 141.) Claimant was discharged on July 15, 2003 with prescriptions for Percocet and ibuprofen." (Tr. at 139.)

On July 26, 2003, Claimant sought treatment at St. Joseph's Hospital's emergency room for abdominal pain. (Tr. at 179.)  Scott Van Fossen, PA-C, advised Ashesh Desai, M.D. that he felt it was Claimant's gallbladder. (Tr. at 183.)  Dr. Desai evaluated Claimant and found "right upper quadrant abdominal pain, cause is not very clear.  We will do a HIDA scan today." (Tr. at 181.) The scan was performed on July 27, 2003 by Peter Strobl, M.D.  Dr. Strobl found

a "normal hepatobiliary scan.  Good gallbladder contractility is demonstrated, and the ejection fraction of 94.2 is normal." (Tr. at 189.)

During the hospitalization, on July 26, 2003, Philip H. Strobl, M.D. performed frontal supine and upright views of the Claimant's abdomen and a PA view of Claimant's chest, with a comparison made with a prior chest x-ray of August 13, 1999. Dr. Strobl concluded "No acute cardiopulmonary disease.  Mild intestinal ileus but no evidence of mechanical obstruction or free air." (Tr. at 190.)

Dr. Strobl also performed a CT abdomen on July 26, 2003 and concluded Claimant had "[d]iffuse fatty infiltration of the liver. Otherwise unremarkable exam.  There is no evidence of bowel obstruction or intra-abdominal inflammation." (Tr. at 191-92.) Dr. Strobl also performed an ultrasound of the right upper quadrant and concluded

> [t]he gallbladder is poorly distended.  No definite gallstones are seen.  Liver echo texture is somewhat coarsened consistent with fatty infiltration which was noted on the recent CT scan.  No focal hepatic masses are seen.  No biliary dilatation is noted.  The pancreas is grossly normal... otherwise unremarkable ultrasound of the upper abdomen.

(Tr. at  193.)

On August 7, 2003, Claimant sought treatment at Camden-Clark Memorial Hospital for an injured back due to "overdid it at work." (Tr. at 311, 317.)  Claimant was discharged and advised to follow-

up with Dr. Ghodsi.  (Tr. at 313-15.)

On August 10, 2003, Claimant sought treatment at Camden-Clark Memorial Hospital for low back pain due to an assault at a campground.  (Tr. at 296, 299.)  Terry C. Shank, M.D., radiologist, reviewed five views of the lumbar spine on that date and found mild degenerative disc changes at the L2-3, L3-4, and L4-5 levels but "no abnormal alignment in anterior to posterior dimension." (Tr. at 309.)  Robert R. Farquharson, M.D. diagnosed Claimant with a lumbar contusion and nasal contusion.  (Tr. at 300, 304-5.)

On September 10, 2003, Abdi Ghodsi, M.D. reported:

James Comuzie was seen back in the neurosurgery outpatient clinic. ... MRI of the lumbar spine from July is reviewed and does show degenerative disc disease and a mild disc bulge, although no severe central or foraminal compression.  I'm somewhat puzzled at the extent of Mr. Comuzie's pain.  His pain appears to be getting worse, and he states that his numbness and tingling in the right foot have worsened as has his low back pain.  However, I do not see any severe stenosis on his back.  I've recommended a lumbar spine flexion/extension and EMGs of the lower extremities to see if we can better evaluate and sort out what the pain generator is.

(Tr. at 166.)

On September 15, 2003, Claimant sought treatment at St. Joseph's Hospital emergency room for back pain.  (Tr. at 474-78.)

On September 20, 2003, Claimant sought treatment at St. Joseph's Hospital emergency room for back pain.  (Tr. at 469-73.)

On September 27, 2003, Claimant sought treatment at St. Joseph's Hospital emergency room for back pain.  (Tr. at 464-68.)

9

On September 30, 2003, Claimant sought treatment at Camden-Clark Memorial Hospital for back pain.  (Tr. at 291-95.)

On September 30, 2003, Claimant sought treatment at St. Joseph's Hospital emergency room for back pain.  (Tr. at 462-63.)

On October 1, 2003, Claimant was admitted to the emergency room ("ER") of St. Joseph's Hospital with complaints of "intractable back pain."  (Tr. at 153.)  Claimant was given "IM Demerol and Toradol every 4-6 hours without much relief, so he was put on a morphine pump which helped with patient's pain.  The patient also received... epidural injection of Depo-Medrol 80 mg and Astramorph."  (Tr. at 154, 163-64.)

On October 1, 2003, during Claimant's hospitalization, Ashesh Desai, M.D., examined Claimant and opined "severe low back pain, most likely musculoskeletal."  (Tr. at 157.)

On October 1, 2003, Claimant underwent an MRI of the lumbar spine and radiologic views of the pelvis/right hip.  Neil R. Strobl, M.D. made the following conclusion regarding the lumbar spine:

> 1) No acute body injury.  2) Mild to moderate degenerative spondylotic changes within the lumbar spine as described above.  This is most prominent at the L3-4 level where a posterior disc spur complex combines with congenitally sport pedicles to cause a very mild central spinal canal stenosis.  3) Bilateral neural foraminal encroachment is seen from L3-4 through L5-S1.  4) No focal disc herniation or nerve root impingement is seen within the lumbar spine.

(Tr. at 176.)

10

Dr. Strobl made the following conclusion regarding the two views of Claimant's pelvis/right hip, when compared to a prior study performed in 1997: "1) Status post right total hip arthroplasty. There is no radiographic evidence for hardware abnormalities. 2) No acute fracture or dislocation seen involving the right hip." (Tr. at 176-77.)

On October 2, 2003, during Claimant's hospitalization, Abdi Ghodsi, M.D., a neurosurgeon, examined Claimant and concluded "[s]evere low back pain or radiculopathy with the majority of the pain localized at the hip." (Tr. at 161.)

On October 2, 2003, Dr. Ghodsi further reported

I am unsure of the etiology of patient's severe pain. I have recommended than an orthopedic consult with Dr. Miller to see whether this hip could be contributing to his symptoms. I have recommended a thoracic spine MRI to rule out a lesion there as could be contributing to the symptoms, although he does not have any findings of myelopathy or other lesion on his examination.

(Tr. at 207.)

On October 2, 2003, during Claimant's hospitalization, G. W. Miller, M.D., examined Claimant and stated

James is a gentleman who was known to me five years ago. I did a total hip arthroplasty on him. X-rays were reviewed prior to seeing the patient... He has pain in his leg, posterior buttock, posterior thigh down to the calf and down to the dorsal aspect of the foot. This obviously does not follow the pattern for pain from a hip joint. He has no tenderness in his groin. He reports he has occasional catching in his groin but no constant pain, no recurring pain with activities.... This appears to be a well functioning total hip arthroplasty. As stated, because of the nature of his pain, I feel it is following more like a dermatome pattern from sciatica

11

> than it is from a prosthetic problem.  The prosthetic
> pain would usually be in the groin or the medial aspect
> of the thigh - not below the level of the knee.  The
> prosthesis appears to be functioning well with no
> complications.

(Tr. at 159.)

On October 2, 2003, Claimant underwent a thoracic spine MRI. Neil R. Strobl, M.D. stated that multiple views of the thoracic spine were obtained and concluded "[n]o acute fracture, malalignment, or significant degenerative disc disease present within the thoracic spine."  (Tr. at 174.)

On October 3, 2003, during Claimant's hospitalization, M. A. Morehead, M.D. provided a report which stated: "EMG and nerve conduction study today show evidence of chronic right sciatic, neuropathy.  There is no evidence of lumbosacral radiculopathy." (Tr. at 162.)

On October 3, 2003, Claimant underwent flexion and extension lateral views of the lumbar spine.  Peter Strobl, M.D. concluded there was "[m]ild degenerative spurring at multiple levels with slight disc space narrowing at L3-4.  2.  No evidence of acute bony injury or ligamentous instability."  (Tr. at 172.)

On October 3, 2003, Michael A. Morehead, M.D., performed an and nerve conduction study and EMG on Claimant.  He concluded "[c]hronic right sciatic neuropathy.  No evidence of radiculopathy."  (Tr. at 167-68.)

Claimant was discharged on October 3, 2003 with prescriptions

for Lopressor, Bactrim, Percocet, and Flexeril with instructions for "bedrest for 24-48 hours and then normal, routine activities. No lifting of heavy weight or use of back excessively.  Follow up with Dr. Ghodsi in two weeks." (Tr. at 155.)

On October 6, 2003, Claimant sought treatment at St. Joseph's Hospital emergency room for back pain.  (Tr. at 453.)  Anil J. Patel, M.D., performed a lumbar epidural block at the lumbar 3-4 level on Claimant.  (Tr. at 455.)

On October 17, 2003, Claimant sought treatment at St. Joseph's Hospital emergency room for back pain.  (Tr. at 448.)  Claimant was diagnosed with chronic low back pain.  (Tr. at 452.)

On October 27, 2003, Claimant sought treatment at Camden-Clark Memorial Hospital for back pain.  (Tr. at 277.)  Claimant was discharged on that same day with a diagnosis of lumbosacral strain, prescribed pain medication, muscle relaxers, anti-inflammatories, and instructed to follow-up with Dr. Ghodsi the following day. (Tr. at 281, 288-90.)

On October 28, 2003, Dr. Ghodsi reported:

Mr. Comuzie was seen back in the neurosurgery outpatient clinic.  He has had several visits to the emergency room... His pain has been severe at times, and he's been on narcotic medication... I continue to be puzzled by Mr. Comuzie's symptoms.  He has been seen by Dr. Miller for the hip, and I do not know if he feels that some of his symptoms could be related to the right hip.  He's had a previous replacement there.  I have reviewed his MRI of the lumbar spine which does not show any significant pathology.  There is a mild disc bulge at L4-5.  Again, this does not cause any severe stenosis or foraminal narrowing. At this time my plan is to proceed with a

13

> myelogram with a CT scan of the cervical and lumbar spine
> to rule out a nerve root cutoff.  If this is negative,
> then I would advocate follow-up with orthopedics and
> possible follow-up with Dr. Patel for further injections.
> I would not recommend any surgical intervention.

(Tr. at 165.)

On October 29, 2003, Claimant underwent a myelogram with CT scan of the cervical and lumbar spines.  Peter W. Strobl, M.D. concluded

> Impression:  1) There is a very mild focal posterior
> central disc bulge at C4-5 which causes only minimal
> effacement of the ventral portion of the thecal sac.
> There is no evidence of spinal stenosis, disc herniation,
> or compression of the neural elements in the cervical
> region. 2) There is very mild degenerative disc disease
> at L3-4 with very minimal posterior disc bulging.  This
> results in a mild degree of spinal stenosis at L3-4 in
> conjunction with mild hypertrophy of the ligamentum
> flavum and facet joint bony overgrowth.  The AP diameter
> of the canal is 9 mm.  This corresponds well to the
> previously noted abnormality on the MRI scan.  3) No
> discrete disc herniation or nerve root compression is
> seen in the lumbar region.  I do not see a clear etiology
> for a right sided radiculopathy.

(Tr. at 170.)

On November 25, 2003, Claimant sought treatment at Camden-Clark Memorial Hospital for right shoulder pain due to a fall while carrying firewood. (Tr. at 264, 269.) Harry A. Marinakis, M.D., diagnosed a right shoulder strain and discharged Claimant on that same date.  He found that "[s]houlder films, four views as interpreted by me are normal with the glenohumeral joint intact. No evidence of dislocation." (Tr. at 267-8, 276.)

On December 15, 2003, Claimant sought treatment at St.

Joseph's Hospital emergency room for a fall at home which resulted in a lower back injury.  (Tr. at 443-47.)

On December 31, 2003, Claimant sought treatment at St. Joseph's Hospital emergency room for a left thigh wound.  (Tr. at 439.)  Treatment notes indicate sutures were removed and Claimant was evaluated for potential infection.  (Tr. at 440-42.)

On April 27, 2004, Claimant sought treatment at Camden-Clark Memorial Hospital for cough/congestion of two to three weeks duration.  (Tr. at 247, 250.)  Claimant was diagnosed with pneumonia.  (Tr. at 254.)  A chest x-ray revealed "lungs appear clear bilaterally with no definite infiltrates.  The heart and mediastinum are within normal limits.  There are no pleural effusions.  The bony structures are unremarkable.  Impression:  No active disease."  (Tr. at 263.)

On July 16, 2004, Claimant sought treatment at Camden-Clark Memorial Hospital for abdominal pain.  (Tr. at 242.)  Claimant received testing through the chemistry and microbiology departments. (Tr. at 244-45.)

On August 1, 2004, Claimant sought treatment at St. Joseph's Hospital emergency room for abdominal pain, headache, and hypertension.  (Tr. at 431-32.) Dr. Philip Strobl obtained a CT of Claimant's head and compared it to a prior head CT of December 27, 1998.  Dr. Strobl concluded there was "[n]o acute intracranial pathology or significant change since 12/27/98... [b]ilateral

15

maxillary sinus disease most pronounced on the left where there is near complete opacification." (Tr. at 433.) Dr. Strobl also obtained a CT of the abdomen and found "[d]iffuse fatty infiltration of the liver." (Tr. at 435.) Dr. Strobl further obtained a portable chest study and found "[n]ormal chest. No change since 7/26/04." (Tr. at 437.) Dr. Strobl also obtained frontal and upright views of the abdomen and compared them with a prior exam of 7/26/04. He found "1) Mild small bowel ileus but no evidence of mechanical obstruction or free air. 2) Status post prior right hip arthroplasty." (Tr. at 438.)

On August 2, 2004, Claimant sought treatment at St. Joseph's Hospital emergency room and was admitted with complaints of hypertension, headache, and abdominal pain. (Tr. at 195.) Claimant was discharged on August 3, 2004 by Titu Das, M.D., following a diagnosis of positive Hepatitis C and a

> CT scan of his head which was negative except for bilateral maxillary sinus disease... On arrival the patient was hypertensive. Blood pressure was 183/112 which has been corrected. His blood pressure today is 136/85. Also, he had an ultrasound of his gallbladder and liver which is consistent with hepatic fatty infiltration. No evidence of biliary obstruction or cholelithiasis.

(Tr. at 198-99, 209.)

On August 2, 2004, C. R. Honaker, M.D. evaluated Claimant at St. Joseph's Hospital and found Claimant

> is not aware of blood transfusions or drugs or history of hepatitis... Consider referring to someone to treat his Hepatitis C. The problem is I do not think he can afford

the medication.   I mentioned to him that there was
treatment for Hepatitis C if he is interested, he is
going to check his finances and see if that might be a
possibility.   It needs to be offered to him and he is
also advised that if he does have chronic Hepatitis C, he
needs to be followed periodically.

(Tr. at 203-05.)

On August 18, 2004, Claimant sought treatment at St. Joseph's
Hospital emergency room for back, shoulder and eye pain resulting
from "an altercation" the previous evening.  (Tr. at 425.)  On that
date, Dr. Philip Strobl obtained cervical spine x-rays and found
"normal cervical spine."  (Tr. at 428.)  Dr. Strobl also obtained
lumbar spine x-rays and found "1. Mild mid lumbar levoscoliosis.
2) Moderate multi-level degenerative disc disease with slight
narrowing and spurring throughout the lumbar spine.  3) No evidence
of acute fracture or destructive process."  (Tr. at 429.)  Dr.
Strobl also obtained a pelvis x-ray and found "1)No evidence of
acute fracture or dislocation.  2) Mild degenerative changes about
the left hip.  3)  Status post prior right hip arthroplasty in good
alignment."  (Tr. at 430.)

On December 20, 2004, Claimant sought treatment at St.
Joseph's Hospital emergency room for right abdominal pain.  (Tr. at
405-6.)  On that date, Dr. Neil Strobl obtained flat and upright
views of the abdomen and frontal view of the chest.  He opined
"[u]nremarkable bowel gas pattern without evidence for obstruction.
No acute pulmonary process." (Tr. at 412.)  Dr. Strobl also
obtained a CT of the abdomen and found "there is diffuse decreased

17

attenuation of the hepatic parenchyma consistent with fatty infiltration. Gallbladder appears unremarkable. The spleen, pancreas, adrenal glands, and kidneys appear normal." Dr. Strobl also noted Claimant's right total hip arthroplasty and found "[n]o gross abnormalities are seen." (Tr. at 413.)

On January 5, 2005, Claimant sought treatment at Marietta Memorial Hospital for chronic pain. (Tr. at 932.) Michael Morehead, M.D. noted Claimant "is on chronic narcotic therapy, taking three Percocet a day. Two weeks ago Neurontin was started 300 mg. Past medical history other than his pain syndrome is not remarkable." (Tr. at 932.)

On January 7, 2005, Claimant sought treatment at Camden-Clark Memorial Hospital emergency room for chest, back, and abdominal pain. (Tr. at 210, 212.) Ferdinand U. Osuji, M.D. assessed Claimant and found "[a]bdominal pain. This is probably secondary to hepatitis based on elevated liver enzymes. Other differential include pancreatitis versus peptic ulcer disease, given the patient's history of chronic alcohol use... The pain is unlikely to be cardiac origin, as it is not anginal." (Tr. at 216.)

On January 8, 2005, the date Claimant was discharged, Claimant underwent an ultrasound of the abdomen which revealed "[n]ormal appearance of the gallbladder. Some increased echogenicity of the liver and may represent fatty infiltration of the liver." (Tr. at 221.) Claimant also underwent a CT of the abdomen and pelvis which

revealed "[m]oderate fatty infiltration of the liver." (Tr. at 222.) A portable radiology examination of the chest revealed "no active disease." (Tr. at 223.)

On February 10, 2005, Claimant sought treatment at Marietta Memorial Hospital emergency room for chest pain. (Tr. at 688.) Claimant was admitted. Testing ruled out myocardial infarction and pulmonary embolism. The chest pain determined to be of noncardiac origin. Claimant underwent esophagogastroduodenoscopy which showed some esophageal stricture. An MRI of the cervical spine was also negative for cervical radiculopathy. (Tr. at 688-90.) Che Fu Kuo, M.D. reported

> the patient appeared to have a tendency to ask for benzodiazepines as well as pain medications. The patient's chest pain largely resolved. He was thus discharged... (and) instructed to follow up with Dr. Merrill who has been his primary care physician and I also told him he already had (not legible) and I am not going to write him any more.

(Tr. at 688.)

On February 14, 2005, Claimant sought treatment at Camden-Clark Memorial Hospital emergency room for a fall which resulted in low back and right hip pain. (Tr. at 231.) Jeff Moncman, M.D., radiologist, examined x-rays of Claimant's lumbar spine and found "intact pedicles and normal SI joints... No fracture is noted. There is no evidence of defect in the pars interarticularis or spondylolisthesis. Impression: 1. Degenerative changes are noted with some disc space narrowing at L4/5 and L5/S1." (Tr. at 241.)

19

Claimant was discharged on February 14, 2005, with a diagnosis of contusion.  (Tr. at 239.)

On March 3, 2005, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's mental impairments were not severe.  The evaluator, James Capage, Ph.D., opined Claimant had no restriction of activities of daily living, no difficulties in maintaining social functioning, no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  Dr. Capage found evidence does not establish the presence of the "C" criteria. (Tr. at 320-333.)  He noted that Claimant "alleges multiple physical problems and depression... As of 2-7-05 by Dr. Figueroa indicates mental status within normal limits.  He does not diagnosis depression but does prescribe Xanax. Claimant's allegation of depression is not supported by diagnosis and findings of the treating source.   Claimant is not fully credible."  (Tr. at 332.)

The record includes treatment notes and other evidence from Emerson Heathcare and Allen D. Figueroa, M.D., dated August 29, 2003 through July 12, 2005, referring primarily to Claimant's attempts to get his pain medications Percocet, Lortab, and Xanax filled early.  (Tr. at 334-382.)

On March 16, 2005, Claimant sought treatment at Selby General Hospital emergency room for a lumbar strain which resulted from "lifting furniture."  (Tr. at 633.)

On May 17, 2005, Claimant sought treatment at Marietta Memorial Hospital emergency room for headache and high blood pressure. (Tr. at 683.) A CT scan was normal. Claimant was treated with Vicodin and Tylenol. (Tr. at 684.)

On July 16, 2005, Claimant sought treatment at Marietta Memorial Hospital emergency room for right hip/leg and back pain. (Tr. at 681.) Claimant was treated with morphine and Zofran. (Tr. at 681.) David Johnson, M.D. reported "He said he had ran out of his Percocet so I wrote for 30 more. He was advised to see Dr. Figueroa this week." (Tr. at 682.)

On July 20, 2005, Claimant sought treatment at St. Joseph's Hospital emergency room due to an assault in which he was "put in a head vice" resulting in neck and back pain. (Tr. at 395, 398.) Dr. Neil Strobl obtained three views of Claimant's right shoulder and found "Osteoarthritis about the acromioclavicular joint. No acute fracture or dislocation of the right shoulder." (Tr. at 401.) Dr. Strobl also obtained multiple cervical spine views and found "[n]o evidence of acute traumatic injury within visualized cervical spine." (Tr. at 403.) Dr. Strobl also obtained multiple thoracic spine views and found "[n]o acute fracture or malalignment within the thoracic spine." (Tr. at 404.)

On July 25, 2005, Claimant sought treatment at Marietta Memorial Hospital emergency room for neck pain. (Tr. at 679.) Claimant's physical exam showed "[v]itals normal. He has

tenderness to the lower paraspinal cervical musculature. Normal symmetrical strength with 2+ symmetric reflexes. No sensory deficits. Nonfocal neurologic exam. No swelling was noted. Head appears atraumatic." (Tr. at 679.) Claimant was treated with Demerol and Phenergan and prescribed Vicodin as needed for pain. (Tr. at 679.)

On August 7, 2005, Claimant sought treatment at Marietta Memorial Hospital emergency room for pain in the right side of his abdomen. (Tr. at 677-78.) Stephen R. Mosberg, M.D. stated

> Patient was given some morphine and Zofran. Repeatedly asked for pain medications during his stay. Consultation undertaken with Dr. McElroy... findings in the abdomen as well as the results of the laboratory studies and CAT scan... lowered the suspicion of appendicitis because of the negative CAT scan and normal white count... Patient was discharged with prescription for Vicodin, Flexeril, and gave him a prescription for all of those.

(Tr. at 678.)

On August 10, 2005, Claimant sought treatment at Marietta Memorial Hospital emergency room for drug abuse. Kenneth Leopold, M.D. assessed Claimant with alcohol and opiate dependency, abuse, and withdrawal. His treatment plan was detoxification observation (Tr. at 674-76.) Dr. Leopold found "[t]he duration of problem has been over twenty years. He denies any current legal issues although he has had a DUI in Florida in the past and he recently had a felony assault against him and drugs were stolen and subsequently his physician stop (sic) treating him." (Tr. at 673.)

On August 23, 2005, Claimant sought treatment at Marietta

22

Memorial Hospital emergency room for abdominal pain. Claimant stated that he had been released from the chemical dependency unit eight days ago. Urinalysis was negative, as was a CT scan of the abdomen and pelvis. Jeffrey A. Patey, M.D. reported Claimant was initially "given Bentyl 20 mg IM. He did not have significant relief of his pain with that so he was given 50 mg of Demerol, Zofran 4 mg, and Ativan 1 mg IV. He is less shaky and his symptoms are better controlled." (Tr. at 671-72.)

On August 29, 2005, Claimant was admitted to Selby General Hospital with complaints of severe and acute right lower quadrant pain. Isidro Amigo, D.O., performed an intra-abdominal exploration wherein he observed

> the patient's appendix appeared quite unremarkable. However, the patient had dense adhesions of the omentum and mid ascending colon to the right upper and lateral peritoneal surface. These were able to be satisfactorily divided... The gallbladder was unremarkable. The patients's appendix was removed to avoid any further consideration of appendicitis with right lower quadrant pain.

(Tr. at 626.)

On September 2, 2005, Claimant sought treatment at Selby General Hospital emergency room for acute abdominal pain. (Tr. at 622-23.)

On September 5, 2005, Claimant sought treatment at Selby General Hospital emergency room for acute abdominal pain. (Tr. at 620-21.) Claimant was admitted and on September 6, 2005, a CT scan of the abdomen and pelvis was performed. The interpreting

23

radiologist, Robert Balestrero, M.D. found: "No stones seen on this examination.  The liver, spleen, pancreas, and gallbladder are normal.  The balance of the examination of the pelvis is within normal limits."  (Tr. at 619.)

On September 12, 2005, Claimant sought treatment at Selby General Hospital emergency room for abdominal pain following an appendectomy two weeks earlier.  (Tr. at 617-18.)

On September 15, 2005, a State agency medical source completed a Psychiatric Review Technique form and opined Claimant's mental impairments were not severe.  The evaluator, Tonnie A. Hoyle, Psy.D., opined Claimant had no restriction of activities of daily living, no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation.  The evaluator found Claimant had mild  difficulties in maintaining social functioning. Dr. Hoyle found evidence does not establish the presence of the "C" criteria. (Tr. at 479-91.)  Dr. Hoyle noted that

> A/P [attending physician] indicates his mental status is
> WNL [within normal limits].  No diagnosis of depression,
> but does prescribe Xanax.  Claimant's allegation of
> depression is not supported by diagnosis and findings of
> the treating source.  PRTF in file from transferred claim
> from WV.  This new PRTF is drafted due to new diagnosis
> in file of drug and ETOH [ethanol-alcohol] dependence and
> abuse.  No psychiatric condition diagnosed.  Claimant
> checked himself into detox four days voluntarily.  He
> admitted to taking prescribed narcotic medication and
> drinking ETOH.  He stated these get him into trouble and
> was recently charged with felonious assault.  These
> records are in file.  He is currently sober per self-
> report.  If any, there would be only mild restrictions.
> Not severe.

(Tr. at 491.)

On September 16, 2005, Claimant was admitted to Selby General Hospital with complaints of abdominal pain.  (Tr. at 615.)  A colonoscopy was performed on Claimant by Isidro Amigo, D.O., who made this finding: "There was minimum degree of mucosal inflammation which was felt to be iatrogenic.  There was no evidence of any bleeding, polyps, diverticuli, angiodysplasia, or any extrinsic pressures."  (Tr. at 616.)

On October 6, 2005, Claimant sought treatment at Selby General Hospital emergency room for chronic low back pain.  (Tr. at 631-32.)

On October 6, 2005, R. Craig Platenberg, M.D. provided an MRI examination of Claimant's lumbar spine upon referral from Charles Merrill, D.O.  Dr. Platenberg concluded "[t]here is no disc herniation.  There is no central spinal canal stenosis.  There is no canal or nerve root compression."  (Tr. at 548.)

On October 7, 2005, Claimant sought treatment at the Selby General Hospital office of Charles Merrill, D.O. for "excruciating back pain."  (Tr. at 612.)  Dr. Merrill noted that

> MRI is now back and shows that he has some mild degenerative disk disease and bulging disks.  No disc herniation or spinal canal or nerve root compromise.  He had a total right hip done after his motor vehicle accident in 1998 and possibly could have shortened leg syndrome because all of this pain started one year after that accident and his surgery.  The pain is better today. Discontinue to home with increased medications.

(Tr. at 612.)

25

On October 10, 2005, Claimant sought treatment at Selby General Hospital emergency room for chest pain. (Tr. at 610-11.)

On October 13, 2005, Claimant sought treatment at Selby General Hospital (Marietta, Ohio) for left-sided chest discomfort. Dr. Merrill stated:

> *Laboratory*: CBC showed all values to be within normal limits times two... Cardiac enzymes were negative throughout the entire hospital stay... Drug screen was positive for morphine, marijuana, Benzodiazepine, antidepressants. Bone scan showed minimal degenerative uptake in the right AC and some uptake of the tip of the prosthesis of the right femur. Chest x-ray was unremarkable... Echocardiogram showed normal left ventricular systolic ejection fraction 68% and minimal tricuspid and mitral regurgitation.
> *Hospital Course*: The patient was admitted to my service for the above radiographic, laboratory, and electrocardiogram results noted. On admission, he was started on clinical pathway for chest pain. He was given Morphine IV for pain as well as Zofran for nausea and vomiting. He continued to show pain but most was felt to be arthritis. Over the night he got increased pain and the patient was moved to ICU for overnight... Whole body bone scan was done which was negative except for some minimal arthritic changes. Cardiac was negative all throughout the hospital stay and it was felt he was stable enough to be discharged to follow up on an outpatient basis.

(Tr. at 493, 498-501.) Claimant was diagnosed with hypertension and prescribed a low salt diet. (Tr. at 494, 496.)

On October 20, 2005, Claimant was evaluated by Joseph R. Mayo, M.D., Grant/Riverside Methodist Hospital (Columbus, Ohio), for continuing chest discomfort. Dr. Mayo found

> Heart cath revealed wide patency of all coronary vessels. He has no blockage greater than 20% in any vessel. There is a history of stent implantation in an unspecified artery several years ago during what he describes as an

26

> acute coronary syndrome in Florida. Ventricular function
> looks reasonable with an ejection fraction of 50%. The
> left ventricular filling pressures were normal. James
> has a chronic pain syndrome involving neuropathic and
> muscular pain. Perhaps this is the cause of this entire
> scenario.

(Tr. at 502, 503-34.)

On November 17, 2005, Claimant sought treatment at Selby General Hospital emergency room for acute chronic low back pain. (Tr. at 606-07.)

On November 18, 2005, Claimant sought treatment at Selby General Hospital emergency room for acute chronic low back pain. (Tr. at 608-09.) Todd Fredricks, D.O., wrote in a note:

> This patient presents with complaints of progressive
> increasing paresthesia with one episode of urinary
> incontinence... The patient should be seen by a
> neurosurgeon. I told him that we would have nothing more
> to offer him in the emergency room other than an emergent
> transfer to neurosurgical services if he became
> incontinent or bowel [sic] or developed paresthesia or
> paralysis of the lower extremities.

(Tr. at 605.)

On November 20, 2005, Claimant sought treatment at Selby General Hospital emergency room for acute chronic low back pain. (Tr. at 603-4.)

On November 26, 2005, Claimant sought treatment at Selby General Hospital emergency room for chronic low back pain. (Tr. at 601-2.)

On November 29, 2005, Claimant was admitted to Selby General Hospital for "pain loss of bladder control." (Tr. at 541.) A CT

27

scan of the lumbar spine was read by Mark A. Hackney, M.D., radiologist, who found "[n]ormal vertebral body height and alignment are maintained.  No fracture is seen.  Endplate degenerative changes are present at L3-4, L4-5, and L2-3.  No fracture is seen.  Paraspinal soft tissues have a normal configuration." (Tr. at 541, 921.)

On December 16, 2005, Claimant sought treatment at Selby General Hospital emergency room "after being in an altercation with two men... He complains of increased pain over the entire body." (Tr. at 595.) Charles Merrill, D. O. discharged Claimant with the following diagnosis:  "Chronic pain syndrome secondary to degenerative disk disease of the cervical, thoracic, and lumbar spine acute exacerbation and recent altercation." (Tr. at 596.)

On December 28, 2005, Mary Manning, LSW, provided a Diagnostic Assessment of Claimant for Washington County Community Health Services.  (Tr. at 572-79.)  Ms. Manning stated Claimant denied having a past psychiatric history and that his chief complaint was "depression and anxiety related to physical condition." (Tr. at 572.)  However, Claimant

> does not feel he needs counseling at present... Having
> seen James Comuzie the week before, patient presents
> himself in more distress as he recently received news
> there is no hope for surgery to relieve pain for sciatica
> as his nerve damage is permanent.  Patient was squinting
> his eyes, but was very alert, and focused, cordial.
> After accident at age twenty-one, which resulted in hip
> replacement, (and his best friend dying that same day in
> a separate accident), patient states he has had some
> depression.  Patient states he was able to work until

28

> summer of '04 when physical symptoms from past injuries
> worsened.  With that came financial stressors... Patient
> states alcohol has been a problem for him in past but not
> since detox in '04.  Patient stated he would be honest,
> that sometimes he does take an extra Percocet.  James
> complains of sleep problems due to pain and worries.

(Tr. at 578-79.)

On January 2, 2006, Claimant sought treatment at Selby General

Hospital emergency room for chronic low back pain.  (Tr. at 600.)

Todd Fredricks, D. O. provided an addendum to the emergency room

report which stated

> This is a 43-year old patient of Dr. Merrill who is well
> known by this emergency room.  This is an individual who
> has recurrent problems with his low back.  He has been
> treated here several times, usually with narcotic
> analgesics and has been told on multiple occasions that
> he needs to be seen by a neurosurgeon or neurologist for
> further care.  He has also been informed that the only
> neurosurgical and neurological support locally is at
> Camden Clark and St. Joseph's Hospital and that we do not
> offer those particular services.  Grant Hospital is also
> the other option...this patient will be discharged and
> will be directed to follow up with his family doctor.

(Tr. at 598.)

On January 2, 2006, Claimant sought treatment at Marietta

Memorial Hospital emergency room for a migraine. (Tr. at 667-68.)

A CT of the brain was obtained and found to be normal by Steven

Boker, M.D. (Tr. at 923.)  Stephen N. Mosberg, M.D. reported that

> [i]n the course of the emergency room after treating the
> patient with pain medication he has requested that
> behavioral medicine see him secondary to his depression
> of the recent deaths in his family.  The psychologist
> arrived.  However, it appeared that the patient had
> eloped after his second treatment with pain medicine.  He
> is no place to be found in the hospital and at this time
> the patient is being discharged.  The patient received

29

> Decadron, Reglan, DHE, and Norflex...        Impression:
> 1. Headache.  2.  Depression.  3.  Drug seeking behavior.
> 4.   Elopement.

(Tr. at 669-70.)

On January 3, 2006, Claimant was sought treatment at Marietta Memorial Hospital for stress and high blood pressure.  (Tr. at 665.)   James Conde, D.O.  evaluated  Claimant  and  diagnosed depression, chronic back pain and chemical addiction/abuse.  He requested Claimant obtain a psychiatric consultation.  (Tr. at 666.)

On January 4, 2006, Claimant had a Comprehensive Psychiatric Exam at Washington County (Ohio) Community Mental Health Services. (Tr. at 569-71.)  David Hill, M.D., assessed Claimant and found in his January 7, 2006 report that Claimant

> has  a  longstanding  history  of  depression,  possibly
> dysthymia, which has gotten worse and is major depression
> disorder now.   Also has a history of substance abuse
> alcohol versus substance dependence alcohol.
> Diagnosis:
> Axis I:   Major Depressive Disorder, Recurrent
>           ? History of Dysthymia Disorder
>           Substance Abuse vs. Dependence Alcohol
>           History of Substance Abuse, Narcotic History of
> Axis II:  Deferred
> Axis III: Chronic Right Leg Pain
>           Chronic Neck Pain
>           Status Post Right Hip Replacement
>           Status Post Coronary Artery Stint Placement
>           Coronary Artery Disease with Unstable Angina
>           Status Post Appendectomy
>           History of Hypertension
> Axis IV:  Moderate to Severe Because of Chronic Pain and
>           Unemployment
> Axis V:   GAF:  45
> Recommendations:
> •   Will try him on Cymbalta.  Told him about possible

30

> side affects.  Told him it could help his pain but
> not necessarily.
> - Will see him back in about one month.
> - Probably should be referred for talking therapy
>   also.

(Tr. at 571.)

On January 6, 2006, Claimant sought treatment at Selby General Hospital emergency room for acute low back pain.  (Tr. at 593-94.) On that date, five views of the lumbar spine were completed and read by Mark A. Hackney, M.D.  Dr. Hackney found "1.  Mild scoliosis and endplate degenerative change.  2.  No evidence of fracture or subluxation."  (Tr. at 918.) Dr. Hackney also obtained a CT of the lumbar spine and concluded "[e]arly endplate degenerative change with no evidence for fracture or subluxation."  (Tr. at 919.)

In an addendum note to the January 6, 2006, emergency room report, Todd Fredricks, D.O. stated

> the issues always come back down to pain medication for
> him and why more pain medication.  He was not given any
> more pain medication than he was given IV.  I will make
> one final note that upon being told he was discharged,
> the patient easily got up out of bed, put his pants on by
> bending over, walked around the bed, retained the rest of
> clothes, bent over, put his shoes on and was then placed
> into a wheelchair for his safety and escorted out of the
> department.
> Impression:  This patient, by any definition, qualifies
> as a noncompliant patient who is probably manipulating
> the system for secondary gain in the form of narcotic
> analgesia.  My concern is that at some point he may well
> secure a specific legitimate injury and not be taken
> seriously.  At this point we will continue to do workups
> on this patient but I am inclined not to give him any
> more pain medication of any kind for any injury that I
> cannot specifically document as being present.  My

> intention is, because of my suspicion, that this is
> secondary gain, that if this patient comes in again with
> frank complaints of neurological deterioration, and I
> make this note for the following attending, including
> myself to reference in the record that the next step will
> be a referral for consultation at Grant Hospital. If the
> patient fails to do so, and it will be noted to Grant
> that we will force the patient by referral so that he can
> no longer avail himself of excuses not to be seen. The
> patient should not be given any more narcotics unless
> full neurological workup is conducted to: 1) rule out
> bonafide neurological abnormality and 2) intervene in his
> behavior which appears to be narcotic seeking.

(Tr. at 592.)

On January 7, 2006, Claimant sought treatment at Selby General Hospital for back pain. He was discharged on January 9, 2006 by Dr. Merrill with a final diagnosis of lumbago, hypertension, tobacco abuse, coronary atherosclerosis, and urinary incontinence. Claimant was transferred to "Grant Hospital via ambulance in stable condition." (Tr. at 550.)

Treatment notes from the OSU [Ohio State University] Medical Center are dated January 9, 2006 through January 12, 2006. (Tr. at 554-66.) A January 11, 2006 report from consulting physician Michael D. Adolph, M.D. made the following assessment of Claimant:

> 1) Acute fall episodes within past week for unclear
> reasons, possibly due to uncontrolled pain in his back,
> right-sided sciatica, and radiculopathy. No history of
> malignancy. 2) Chronic right lower extremity neuropathic
> pain related to right sciatic nerve injury and right hip
> dislocation in motor vehicle accident in 1984. 3)
> Neuropathy on the plantar aspect of his left foot
> possible secondary to diabetes. 4) Urinary incontinence
> times two within the past week... Opioid therapy was
> permitted him an improved level of functioning. Mr.

32

> Comuzie has intractable non-malignant pain warranting
> long-term opioid therapy given his prior response,
> current response, and anticipated long-term pain therapy
> needs.

(Tr. at 557-58.)

A Psychiatric Progress Note from Washington County Community Mental Health Services dated January 17, 2006 states that Claimant couldn't take Cymbalta due to dizziness and that Lexapro would now be tried. (Tr. at 567.)

On January 17, 2006, Claimant sought treatment at Selby General Hospital emergency room for pain in his right foot and leg. (Tr. at 587.) He was discharged to home with a clinical impression noted as "chronic pain drug addiction (?)". (Tr. at 588.) Roger D. Anderson, M.D. wrote an addendum to the emergency room note stating that Claimant

> is very well known to myself and other members of the
> emergency room staff as well as members of the emergency
> room staff at Marietta Memorial Hospital for his frequent
> presentations and demands for narcotic analgesia. The
> patient presented today in his usual fashion, complaining
> of severe pain... The patient was given IM Nubain and IM
> Solu-Medrol at the direction of Dr. Merrill. After he
> was given these medications, however, he was still not
> happy and demanded additional medication. I went into
> the room to re-examine the patient and found him to be
> somewhat uncooperative. The patient had threatened
> nursing staff that he might "fall" if he did not get his
> narcotic pain medication. The patient transferred
> himself from the wheelchair to the cot in the room
> without any difficulty whatsoever. He seems fully mobile
> and moving his back, flexing and extending his back as
> well as his hip and knee on both sides without any
> difficulty whatsoever... The patient became hostile and
> abusive and left the emergency room prior to signing his
> release documents, stating that he would make an official
> complaint against me for not being more sympathetic to

33

his perceived pain.  The patient is to follow up with Dr. Merrill.

(Tr. at 917.)

On January 24, 2006, Claimant was transferred to Selby General Hospital from Marietta Memorial Hospital emergency room where he sought treatment for chest pain.  (Tr. at 662-64.)  David G. Johnson, M.D. noted

> The patient was treated according to chest pain pathway. He was given morphine and Zofran with no relief.  He was given some Dilaudid.  The old records were reviewed which showed that he has some suspicion of drug abuse.  The patient's case was discussed with Dr. Humphrey, and since the pain has lingered on and he has coronary disease he agreed to keep him in observation and follow the chest pain pathway.

(Tr. at 663.)

In a January 24, 2006 report, F. A. Humphrey, D.O. noted that Claimant

> does have a history of arteriosclerotic heart disease, having a coronary stent placed in the year 2003.  He did undergo a cardiac catheterization in August of 2005 that did show patency of the coronary stent... He has been doing well recently with his cardiac status until approximately two days ago.  He started complaining of chest pain and discomfort.  He did not have any nitroglycerin at home, however, he was given nitroglycerin in the emergency room.  EKG shows sinus rhythm with no acute change.

(Tr. at 584.)

On January 27, 2006, Claimant sought treatment at Selby General Hospital emergency room for acute chest pain and was "transferred [to] Riverside."  (Tr. at 582-83.)

On January 27, 2006, Claimant was admitted to Riverside

Methodist Hospital in Columbus, Ohio, where a CT scan of the pulmonary arteries and a left heart cath were performed. (Tr. at 637-53.) A coronary spasm was detected and treated. The CT was negative for pulmonary embolic disease. (Tr. at 635, 640, 653.) Claimant was released on January 31, 2006 with instructions to follow up with his primary care physician, Mid Ohio Cardiology, in one to two weeks. (Tr. at 635.)

On January 31, 2006, Richard J. Candela, M.D., of Mid Ohio Cardiology and Vascular, reported to Dr. Merrill regarding Claimant:

> Catheterization revealed the following:  His stent is patent.  His coronaries show modest disease, but there is quite a bit of coronary spasm and it is very likely this is producing some of his chest pain.  Following intracoronary nitro, most of this resolved and the arteries looked pretty good.  At this point in time I would think continued aggressive medical therapy with discontinuation of smoking and the addition of Imdur and a calcium channel blocker would be the best option.

(Tr. at 914.)

On February 9, 2006, Claimant was admitted to Marietta Memorial Hospital with complaints of chest pain.  (Tr. at 654-61.) An assessment signed by Che Fu Kuo, M.D. noted Claimant did not appear to be in severe distress. (Tr. at 654.)  Dr. Kuo opined that with Claimant's "history of coronary artery disease the concern would be unstable angina.  Dr. Goulder has seen him already and thinks this is not cardiac... need an EGD for evaluation of peptic ulcer for the noncardiac chest pain."  (Tr. at 655.)

Eric Goulder, M.D. opined in a February 9, 2006 report that "[w]ith a catheterization just a week ago, this chest discomfort he is having could not possibly be coronary disease causing it. He is taking Relafen 700 mg three times a day and perhaps the discomfort is all GI in origin. (Tr. at 661.)

On February 10, 2006, Claimant had an MRI of the cervical spine at Marietta Memorial Hospital. Steven Boker, M.D. concluded "[n]o frank disk herniation, neural encroachment, or cervical stenosis is evident. There is slight subligamentous disk bulging at C4-C5 and C5-C6 without significant effect upon the exiting nerve roots." (Tr. at 912.)

A March 2, 2006, psychiatric progress note from Washington Community Mental Health Services states Claimant is "worried and depressed all the time... On edge waiting for his disability claims he'll get word in one week on some. Hopefully it will be favorable." (Tr. at 799.)

On March 16, 2006, a State agency medical source completed a Physical Residual Functional Capacity Assessment and opined that Claimant could perform light work with an ability to frequently balance, and occasionally climb ramp/stairs, stoop, kneel, crouch and crawl. Claimant could not climb ladder/rope/scaffolds. Claimant had no manipulative, visual, communicative, or environmental limitations. (Tr. at 692-700.) The evaluator, Edmond Gardner, M.D., opined that "Claimant is partially credible. He

notes he can only walk and sit for thirty minutes at a time. Subjective limitations are not fully supported by objective evidence." (Tr. at 697.) The evaluator concluded "RFC affirmed. Symptoms appear out of proportion to objective evidence. Drug seeking activity appears to play a big role in this. Has Psych issue." (Tr. at 700.)

On April 4, 2006, Claimant underwent an upper gastrointestinal study. Jeffrey Yost, M.D., radiologist, found "Upper GI study shows a sliding hiatal hernia but no current reflux... Grossly no acute ulcer or inflammatory process. Mucosal pattern of the esophagus is within normal limits at this time." (Tr. at 910.)

On July 15, 2006, Claimant underwent abdominal CT at Selby General Hospital. Robert Smith, M.D., radiologist, concluded "[n]egative non-contrast CT of the abdomen and pelvis. No evidence for hydronephrosis or renal stones or other urinary tract obstruction." (Tr. at 908.)

On August 1, 2006, Claimant sought treatment at Marietta Memorial Hospital after missing the last step out of his home. (Tr. at 713.) In the ambulance, he was given morphine and Valium with no improvement in pain. In the emergency room, an MRIs and CTs of Claimant's lumbar and thoracic spine were negative for acute abnormality. (Tr. at 713, 734, 735, 736.) Michael Tatro, M.D., reported that Claimant "fell this morning and had back pain. He states that he could not move earlier this morning and could not

feel his lower extremities, however, the patient is moving all over when he presented to the emergency department." (Tr. at 729-30.)

On August 3, 2006, Claimant sought treatment at Marietta Memorial Hospital for pain in his right sacroiliac joint and back related to a fall at his home. (Tr. at 703.) Claimant was admitted and treated by Drs. Tatro, Minard, Lacey, Ghodsi, and Anderson. (Tr. at 703.) Roger Anderson, M.D. physically examined Claimant and found: "He is a healthy appearing Caucasian male in absolutely no distress... At this point the patient will be discharged on p.o. Percocet. I have given the patient 80 Percocet 5/325 mg dose at the recommendation of Dr. Minard." (Tr. at 703-04.)

On August 4, 2006, Seyed Ghodsi, M.D. examined the claimant at Marietta Memorial Hospital in relation to his earlier fall, and recommended

> proceeding with thoracic MRI just to complete the workup. If this is negative, then I would recommend conservative management with some time to see if his acute exacerbation will settle down. I think it is going to be very difficult to rid this patient of his chronic pain problems and narcotic dependence. I think once his acute pain settles down, no other surgical intervention is necessary.

(Tr. at 721.)

On August 4, 2006, Claimant underwent a pelvis MRI, thoracic MRI, and lumbar MRI at Marietta Memorial Hospital. Regarding the thoracic spine, Scott Silk, D.O. reported: "1. No abnormal contrast enhancement. No abnormal signals are observed within the

cord, thecal sac or bone marrow.  2.  Mild degenerative changes are seen of the lower thoracic spine in the form of anterior osteophytes."  (Tr. at 727.)   Regarding the pelvis, Dr. Silk reported:  "1. No evidence for fracture or intrinsic bony lesion. 2.  On both sides of the SI joint, there is increased signal on the T2 fat-sat sequences suggestive of mild edema or inflammation...some minimal inflammation...suggestive of strain." (Tr. at 725.)   Regarding the lumbar MRI, Dr. Silk compared it to the lumbar MRI of August 1, 2006 and reported "no abnormal signal changes...no abnormal enhancement pattern is noted.   The bone marrow, thecal sac, and cord all appear to show normal signals." (Tr. at 733.)

On August 5, 2006, Alexander Minard, M.D. examined the claimant in relation to his earlier fall and opined "I think that the patient has had a really severe sacral iliac joint sprain/strain to the point where he has developed bone edema in the ileum and sacrum... I am going to have Hanger Orthopedics come by to get him fitted for a SI joint belt to help support the joint... I will increase him to the stronger dose of Percocet because he does have a high tolerance to these medications given the fact that he has been on them for years." (Tr. at 717-18.)

A discharge summary dated August 11, 2006, from Washington County Community Mental Health Services states "client moved Parkersburg, WV." (Tr. at 802.)   The form states the reason for

admission on December 27, 2005 was "[d]epression/anxiety/chronic pain" and that at discharge the box is checked for "no change." (Tr. at 802.)

On August 11, 2006, Claimant sought treatment at Charleston Area Medical Center emergency room for chest pain.  He was admitted and diagnosed with pulmonary embolism – therapeutic on Coumadin, coronary artery disease, hypertension, anemia, and Hepatitis C. (Tr. at 811.)  Claimant was discharged on August 15, 2006, with instructions to follow a cardiac diet and to follow up with his primary care physician. (Tr. at 812.) John G. Rosencrance, M.D. stated

> [t]here was some concern with the patient's constant insistence upon narcotic medication.   There was difficulty providing adequate analgesia to the patient. He does have a history of chronic narcotic usage and chronic pain secondary to back injury and right hip injury.  The patient was advised and we discussed at length, the possibility that he was a narcotic abuser.

(Tr. at 812.)

On August 16, 2006, Claimant underwent testing at Selby General Hospital.  Dennis M. Burton, M.D., radiologist, opined that the venous bilateral of the lower extremities showed "[p]robable deep vein thrombosis, right posterior tibial vein."  (Tr. at 905.) Dr. Burton also performed a CT of the chest which "shows question of small pulmonary emboli in the distal pulmonary vessels on the right side."  (Tr. at 906.)

On August 31, 2006, Claimant sought treatment at Camden Clark

40

Memorial Hospital emergency room for chest and back pain.  (Tr. at 765.)  He was admitted for observation.  A chest CT was negative for pulmonary embolism. (Tr. at 768.) A chest one view revealed the "cardiac silhouette is within normal limits."  (Tr. at 782.) A chest two view the following day revealed the "heart size is within normal limits.  No overt failure." (Tr. at 783.)

During Claimant's hospitalization, an August 31, 2006 cervical MRI found "exam appears normal except for minor degenerative changes and spurring."  (Tr. at 780.)  A September 1, 2006, lumbar MRI showed "mild to moderate degenerative disc disease in the L3 through L5 vertebral disc space with mild degree of central canal stenosis at L4-5."  (Tr. at 773, 784-85.)  Claimant was discharged on September 3, 2006, by Terrence A. Gilbert, D.O., who noted Claimant "was frequently asking for pain medication and asked me every day of his evaluation to increase his pain medication both in dose and frequency.  It was concerning and suspicious for opioid dependency."  (Tr. at 773.)

The record contains office notes from Charles Merrill, D.O., dated November 7, 2005 through September 8, 2006.  (Tr. at 886-97.) Although largely illegible, the approximately nine office visits indicate Claimant was treated for chronic multiple musculoskeletal complaints, coronary artery disease, hypertension, rheumatoid arthritis, osteoarthritis, chronic low back pain with right leg radiculopathy, lumbar spine degenerative disc disease, chronic pain

syndrome, and depression.   (Tr. at 887, 893-7.)   A note dated February 20, 2006 states "at this time patient is unemployable. Est 6-9 months til able to RTW [return to work]."   (Tr. at 890.)

The record contains office notes from Family Health care dated September 12, 2006 through October 6, 2006.   Although largely illegible, the five office visits indicate Claimant had complaints of pain, numbness, anxiety, coughing, vomiting, gastrointestinal bleeding, weakness, and dizziness. (Tr. at 793-797.)

On September 30, 2006, Claimant was sought treatment at Camden Clark Memorial Hospital for gastrointestinal and rectal bleeding. (Tr. at 755-63.)   Claimant was admitted and underwent placement of a Greenfield filter and upper and lower endoscopies done by Dr. Kaplan on October 2, 2006.   Claimant was discharged on October 6, 2006 with instructions to see Dr. Shiffler on that date.   (Tr. at 762.)

<u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant asserts that the Commissioner's decision is not supported by substantial evidence because (1) the ALJ failed to pose a complete hypothetical question to the vocational expert when he did not include all Claimant's limitations; and (2) the ALJ erred in assessing Claimant's credibility regarding the combined effects of his impairments per Social Security Ruling 96-8p. (Pl.'s Br. at 3-15.)

The Commissioner argues that the ALJ's decision is supported

by the substantial evidence because (1) the vocational expert responded to a hypothetical question that fairly set out all of Claimant's limitations from his impairments, both individual and combined; and (2) the ALJ properly assessed the medical evidence and Claimant's credibility. (Def.'s Br. at 8-14.)

Hypothetical Question

Claimant first takes issue with the ALJ's hypothetical question posed to the vocational expert. Claimant argues that the ALJ erred in failing to include all of Claimant's limitations; specifically, his pain, his inability to focus and sustain a routine for extended periods, and his depression. (Pl.'s Br. at 5-11.) Claimant asserts the ALJ's hypothetical was "egregiously understated" his physical, psychological and emotional problems. (Pl.'s Br. at 5.) Claimant argues that if the ALJ disagreed with the treating physicians' opinions and Claimant's reports of pain and limitations, he should have hired a medical expert to testify. (Pl.'s Br. at 9.)

The Commissioner argues that Claimant's assertion regarding the hypothetical question has no merit because the vocational expert responded to a hypothetical question that fairly set out all of Claimant's limitations from his impairments, both individual and combined. The Commissioner asserts that the ALJ posed a hypothetical question that included limitations well beyond those Claimant possesses and that the ALJ gave Claimant "the benefit of

43

the doubt and included limitations that were far greater than the record could ever support." (Def.'s Br. at 12-13.) In response to Claimant's assertion that the ALJ should have hired a medical expert to testify, the Commissioner states that such an action was unnecessary in light of the abundant medical records indicating Claimant's alleged limitations. (Def.'s Br. at 13.)

At the October 25, 2006 hearing, the ALJ posed this hypothetical question:

> Based on the Claimant's age, education and work experience, assume the residual functional capacity for sedentary work with the following additional limitations. He would require a sit/stand option every thirty minutes. He should never climb a ladder, rope or scaffold. He could occasionally climb stairs and ramps, occasionally balance, stoop, kneel, crouch and crawl. He should avoid concentrated exposures to extreme cold, extreme heat, humidity, noise, vibration and hazards including exposures to heights and machinery. The first question is with those limitations, would he be able to perform his past work?

(Tr. at 950.)

The vocational expert testified that such an individual could not perform his past work but he could perform sedentary work in the national economy and identified the occupations of surveillance systems monitor and dowel pin inspector. (Tr. at 950-51.)

Claimant's attorney's hypothetical question was "[w]ould the cane be possible in the two examples that you've given?" (Tr. at 951.) The vocational expert responded: "Yes, they would. Most of them are sitting primarily." (Tr. at 951.) Claimant's attorney then asked: "If because of pain the Claimant was off task even as

44

much as ten percent of the time, is that consistent with competitive employment?" (Tr. at 951) The vocational expert responded: "That would eliminate those two jobs." (Tr. at 952.) Claimant's counsel concluded with the question: "And would that also be true if he missed more than two days per month?" (Tr. at 952.) The vocational expert responded "if that were to come over three months, then it would be unacceptable." (Tr. at 952.)

In his decision, the ALJ considered the hypothetical questions and concluded that "[t]he vocational expert was unable to identify occupations based on hypothetical questions posed by the claimant's representative. However, the objective medical evidence does not support limitations of the severity posed by the claimant's representative." (Tr. at 30.)

Contrary to Claimant's assertions, the ALJ fully considered Claimant's pain and depression issues before posing his hypothetical question. The ALJ wrote extensively about Claimant's complaints of pain, his psychiatric examination and his drug-seeking behavior. (Tr. at 24-25, 28-29.) The ALJ found

> [t]he claimant testified to weakness secondary to medications; however, the objective medical evidence reflects no side-effects of medications to preclude occupations identified by the vocational expert. The objective medical evidence does not support limitations beyond the claimant's residual functional capacity as determined. As previously noted, the claimant testified that he helps his disabled fiancee with chores such as dishes, dusting, and laundry... the claimant testified to no mental health treatment, and he is not prescribed psychotropic medication.

(Tr. at 28-29, 942-43, 946.)

Claimant asserts that the ALJ misstated his activities of daily living when he found Claimant "helps his disabled fiancee" with chores such as dishes, dusting, and laundry. (Pl.'s Br. at 9.)  Claimant argues that the ALJ ignores the fact that Claimant uses a cane to ambulate and is unable to stand or walk for extended periods of time. (Pl.'s Br. at  11-12.)

It is noted that Claimant clearly testified when asked:

Q: What do you do around the house?
A: I'll help her with the dishes and whatever she needs done, dust the furniture, dust the TV's and just help her in any way I can, your Honor, the laundry.

(Tr. at 946.)  Further, the ALJ's hypothetical does "require a sit/stand option every thirty minutes." (Tr. at 950.)

The court proposes that the presiding District Judge find that the hypothetical question posed by the ALJ included those limitations that were supported by substantial evidence of record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (While questions posed to the vocational expert must fairly set out all of Claimant's impairments, the questions need only reflect those impairments that are supported by the record.). The ALJ's residual functional capacity finding related to Claimant's impairments reflected Claimant's limitations, including pain and the effect that his pain and his other symptoms would have on his ability to work, as supported by substantial evidence of record. These limitations were included in a hypothetical question, and the

vocational expert identified a significant number of jobs that Claimant could perform.

<u>Credibility</u>

Claimant next takes issue with the ALJ's assessment of his credibility regarding the combined effects of his impairments per Social Security Ruling 96-8p. Claimant asserts that his "limp, necessity of a cane for ambulation, shortness of breath, chest pain, side effects of his pain medication, and his need to stop and rest when he is performing tasks were not evaluated by the ALJ and they are clearly documented in the record in this case." (Pl.'s Br. at 14.) Claimant states that Social Security Ruling 96-8p requires that the residual functional capacity assessment "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g. daily activities, observations)." (Pl.'s Br. at 11.)

The Commissioner argues that the ALJ properly assessed the medical evidence and Claimant's credibility. The Commissioner states that treating doctors failed to identify any acute problems, observed normal function, and opined that Claimant was chronically addicted to pain medication. (Def.'s Br. at 3-6.) Further, Claimant testified that he was not receiving psychiatric treatment or medication, assisted his disabled fiancee, made inconsistent statements, and was "out enough to get involved in at least four

fights that required medical attention." (Def.'s Br. at 5-7, 10.)

Contrary to Claimant's assertions, the ALJ's decision fully complied with the requirements of Social Security Ruling 96-8p that

> [i]n assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe." While a "not severe" impairment(s) standing alone may not significantly limit an individual's ability to do basic work activities, it may--when considered with limitations or restrictions due to other impairments--be critical to the outcome of a claim. For example, in combination with limitations imposed by an individual's other impairments, the limitations due to such a "not severe" impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do.

SSR 96-8p, 1996 WL 362207, *34477 (1996).

Social Security Ruling 96-7p clarifies when the evaluation of symptoms, including pain, under 20 C.F.R. §§ 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; explains the factors to be considered in assessing the credibility of the individual's statements about symptoms; and states the importance of explaining the reasons for the finding about the credibility of the individual's statements. The Ruling further directs that factors in evaluating the credibility of an individual's statements about pain or other symptoms and about the effect the symptoms have on his or her ability to function must be based on a consideration of all of the evidence in the case record. This includes, but is not limited to:

- The medical signs and laboratory findings;

- Diagnosis, prognosis, and other medical opinions provided by treating or examining physicians or psychologists and other medical sources; and

- Statements and reports from the individual and from treating or examining physicians or psychologists and other persons about the individual's medical history, treatment and response, prior work record and efforts to work, daily activities, and other information concerning the individual's symptoms and how the symptoms affect the individual's ability to work.

In his decision, the ALJ considered the evidence of record related to Claimant's impairments and concluded that while his status post right hip replacement, degenerative disc disease of the cervical, lumbar and thoracic spines, osteoarthritis of the right shoulder, and coronary artery disease with status post stent placement were severe impairments, he retained the functional capacity to perform a limited range of sedentary work. He reasoned that Claimant's daily activities are inconsistent with disabling pain, that there was no objective medical evidence reflecting side effects of medications to preclude occupations identified by the vocational expert, that while Claimant had surgery in the past, he is presently having only conservative treatment. (Tr. at 21-30.) The ALJ found:

49

The claimant testified that he had undergone right hip replacement in 1997; however, he was able to work with this condition.  He did not cease work until December 2003.  Notably, an x-ray of the claimant's pelvis on August 18, 2004, reflected good alignment of status post right hip arthroplasty (Exhibit 10F-36).

The objective medical evidence does not support disabling back and neck pain or the claimant's testimony that he experiences back and right leg pain of the severity that he must lie down... An MRI of the claimant's lumbar spine on August 1, 2006, revealed no evidence of spinal or foraminal stenosis.  An MRI of the claimant's lumbar spinal cord on September 1, 2006, revealed mild to moderate degenerative disc disease... A CT scan of the claimant's thoracic spine on August 1, 2006, revealed mild to moderate anterior osteophytes... An MRI of the claimant's cervical cord and spine on August 31, 2006, were normal with the exception of minor degenerative changes and spurring.  (Exhibit 29-F-40).

X-rays of the claimant's right shoulder on July 21, 2005, revealed osteoarthritis of the acromioclavicular joint, but no acute fracture or dislocation (Exhibit 10F-7).

A discharge summary from Selby General Hospital on October 15, 2005, reflects that the claimant underwent a body scan that revealed no abnormalities with the exception of minimal arthritic changes (Exhibit 12F-1).

The claimant's testimony and the objective medical evidence do not support disabling chest pain.  The claimant testified to chest pain at occurrences of at least every two months.  Although he reported anxiety, stress, and hypertension cause his chest pain, the claimant testified to no psychological treatment.  He is not prescribed medication for anxiety even though he has a medical card, and the objective evidence reflects no diagnosis of anxiety...

The evidence also reflects inconsistent statements from the claimant, which reflect poorly on his credibility, and a history of drug-seeking behavior.  By telephone contact in July 2005, the claimant reported that he did not do laundry or clean (Exhibit 4E); however, the claimant testified that he helps his disabled fiancee with chores such as dishes, dusting, and laundry.  The claimant reported no use of ambulatory aids in contrast

to his testimony that he has used a cane for two years
(Exhibit 4E).   Treatment records on September 10, 2003
and October 28, 2003, reflect Dr. Ghodsi was puzzled by
the claimant's pain complaints.  An MRI of the claimant's
spine had not revealed significant pathology... Although
the claimant testified to no drug usage for years, during
a hospitalization at Selby General Hospital in October
2005, a drug screen was positive for morphine, marijuana,
Benzodiazepine, and antidepressants (Exhibit 12F-1).
During a psychiatric examination by Dr. Hill on January
4, 2006, the claimant reported that he had taken more
pain medication (Percocet) than prescribed at times in
the past (Exhibit 19F-4).  On January 6, Todd Fredricks,
D.O., with Selby General Hospital, noted that the
claimant had repeatedly reported to the emergency
department for complaints of a neurological nature and
requested pain medication (Exhibit 20F-11).   Dr.
Fredricks noted that the claimant should not be given
future narcotic medication unless a complete neurological
workup was conducted to rule out a bona-fide neurological
abnormality (Exhibit 20F-11).   On September 3, 2006,
Terrance A. Gilbert, D.O., with Camden Clark Memorial
Hospital noted that the claimant's complaints of pain
appeared to be out of proportion with objective findings
demonstrated by an MRI (Exhibit 29F-33).  The claimant
frequently asked for pain medication and an increase in
his pain medication (Exhibit 29F-33).  Dr. Gilbert was
concerned and suspicious about opioid dependency (Exhibit
29F-33).

The  claimant  testified  to  weakness  secondary  to
medications; however, the objective medical evidence
reflects no side-effects of medications to preclude
occupations identified by the vocational expert.   The
objective medical evidence does not support limitations
beyond the claimant's residual functional capacity as
determined.

(Tr. at 26-28.)

With respect to Claimant's argument that the ALJ wrongfully

discredited  Claimant's  subjective  complaints  of  pain  and

limitations, the court proposes that the presiding District Judge

find that the ALJ properly weighed Claimant's subjective complaints

of pain and properly assessed Claimant's credibility and the combination of his impairments, in keeping with the applicable regulations, case law, and social security ruling ("SSR") and that his findings are supported by substantial evidence.  20 C.F.R. § 404.1529(b)(2006); SSR 96-7p, 1996 WL 374186 (July 2, 1996); <u>Craig v. Chater</u>, 76 F.3d 585, 594 (4th Cir. 1996).

For the reasons set forth above, it is hereby respectfully RECOMMENDED that the presiding Chief District Judge AFFIRM the final decision of the Commissioner and DISMISS this matter from the court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby FILED, and a copy will be submitted to the Honorable Joseph R. Goodwin.  Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have ten days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of <u>de novo</u> review by the District Court and a

waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, Chief Judge Goodwin, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

_____February 17, 2009_____
        Date

                                        _Mary E. Stanley_
                                        Mary E. Stanley
                                        United States Magistrate Judge